Receipt number CUSFCC-8755002

# UNITED STATES COURT OF FEDERAL CLAIMS

Joshua J. Angel, on behalf of himself and
all others similarly situated,

        Plaintiff,

v.

THE UNITED STATES,

        Defendant.

No. __23-__ **23-800 C**

# CLASS ACTION COMPLAINT

Joshua J. Angel ("Plaintiff"), on behalf of himself, and all other similarly situated owners of non-cumulative preferred shares of the Federal National Mortgage Association ("Fannie Mae"), and/or the Federal Home Loan Mortgage Corporation ("Freddie Mac," and collectively with Fannie Mae, the "GSEs," "Fannie/Freddie," or the "Companies"), brings this class action complaint ("Complaint") against the United States due to the United States Department of Treasury's ("Treasury"); (a) breaching its guaranty of contractual obligations created under the Companies' non-cumulative preferred share ("Junior Preferred") certificates of designation ("CODs"), (b) breaching the federal government's Implicit Guaranty of Fannie Mae, Freddie Mac Junior Preferred quarterly dividend rights, by directing shareholder dividend entitlement to Treasury Senior Preferred shares, (c) breaching HERA federal agency GSE statutory authorization for Companies' administration, in continuous illegal extractive actions, of quarterly sweep of approximately $500 million, January 1, 2013 to date, company funds

which by contract should have remained with the GSEs for post-conservatorship dividend payment to Junior Preferred shareholders, (d) breaching the 2022 agreement to settle *Angel v. United States* No. 20-737C ("*Angel II* Settlement Agreement") unjustly, and (e) declaratory relief finding of, (i) federal government Implicit Guaranty of Junior Preferred legal obligations timely payment, and (ii) Junior Preferred share permanent impairment, rendering the shares mandatorily redeemable at conservatorship, and/or case end.[1,2] Plaintiff alleges the following based on personal knowledge or information and belief. Plaintiff's information and belief are based on, *inter alia*, public documents and testimony (including sources identified in *Angel v. United States*, No. 1:20-CV-737, *Angel v. United States*, No. 22-867, and other actions and court filings), speeches, studies, books, and Plaintiff's and its counsel's investigation.

## I.    INTRODUCTION

1.    Plaintiff brings this action on behalf of himself and all other holders of Junior Preferred shares of either or both Fannie Mae and Freddie Mac, issued prior to September 6, 2008 (the "Class"). Plaintiff, on behalf of himself and the Class, seeks to recover damages emanating from Treasury's: (a) quarterly breaching of COD Junior

---

[1] The GSE's also issued preferred share securities to Treasury that are, in certain respects, superior to the Junior Preferred. Treasury, the sole shareholder of such superior shares ("Senior Preferred") is excluded from the Class as defined below.

[2] Illegal extraction in Federal Court decisional invocation of major questions doctrine recitation, as federal administrative agency need, to point to "clear congressional authorization" when claiming power to make decision of "vast economic and political significance." *See West Virginia v. EPA*, Supreme Court, June 30, 2022.

Treasury inability to point to HERA statute, or other authority, for quarterly illegal extraction of approximately $500 million of Junior Preferred share dividend entitlement beginning January 1, 2013 to date being case in point.

Preferred legal obligations, (b) quarterly breaches of the federal government Implicit Guaranty of Fannie Mae/Freddie Mac contractually mandated quarterly dividend rights, by directing shareholder dividend entitlement, to Treasury "Senior Preferred" shares in unjust Treasury enrichment, (c) breaching HERA federal agency GSE statutory authorization, for Companies' administration in continuous quarterly illegal extractive sweep of approximately $500 million, 2013 to date, GSE's funds which by contract should have remained with the GSEs for post-conservatorship dividend payment to Junior Preferred shareholders, (d) breaching the 2022 Angel Settlement Agreement unjustly, and (e) declaratory relief findings of (i) federal government Implicit Guaranty of Junior Preferred legal obligations of timely payment, and (ii) Junior Preferred share permanent impairment, renderings the shares mandatorily redeemable at conservatorship, and/or case end.

2.      Fannie/Freddie Junior Preferred CODs are contracts, creating contract rights in Plaintiff and contract obligations in Defendant, **by reason of the terms thereof, and by reason of the Defendant's guaranty of timely payment of Junior Preferred share legal obligations**, including but not limited to, (a) cumulative dividends payable at CODs' specific payment dates, (b) legally declared dividends payable at board of directors ("BOD") specified payment dates, and (c) share principal face amounts payable at COD Junior Preferred specified maturity, and mandatorily redeemable at conservatorship termination, in event of then uncured impairment.

3.      More specifically, the CODs require the Companies' respective BODs, to make reasonable, good-faith determinations in their "sole discretion" every fiscal quarter as to whether to declare a dividend payment on the Junior Preferred shares.

## Senior Preferred Stock Purchase Agreement

4.      On September 6, 2008, attendant to the financial crisis, Fannie Mae and Freddie Mac were placed into conservatorship, and the Conservator, the Federal Housing Finance Administration ("FHFA"), on behalf of each GSE, entered into identical Senior Preferred Stock Purchase Agreements ("SPSPAs") with Treasury, pursuant to which the GSEs each issued Senior Preferred shares to Treasury.

5.      Federal Government  GSEs conservatorship announcements September 6, 2008:

A.  Treasury Secretary, Henry M. Paulson, Jr.:

*"These Preferred Stock Purchase Agreements were made necessary by the ambiguities in the GSE Congressional charters, which have been perceived to indicate government support for agency debt and guaranteed MBS. Our nation has tolerated these ambiguities for too long, and as a result GSE debt and MBS are held by central banks and investors throughout the United States and around the world who believe them to be virtually risk-free.  Because the U.S.  Government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt and MBS.*

*Market discipline is best served when shareholders bear both the risk and the reward of their investment. While conservatorship does not eliminate the common stock, it does place common shareholders last in terms of claims on the assets of the enterprise.*

*Similarly, conservatorship does not eliminate the outstanding preferred stock, but does place preferred shareholders second, after the common shareholders, in absorbing losses. The federal banking agencies are assessing the exposures of banks and thrifts to Fannie Mae and Freddie Mac. The agencies believe that, while many institutions hold common or preferred shares of these two GSEs, only a limited number of smaller institutions have holdings that are significant compared to their capital."*

B.  FHFA Director, James Lockhart:

*"... in order to conserve over $2 billion in capital every year, [payment of] the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding.  Subordinated debt interest and principal payments will continue to be made."*

6.    Neither Secretary Paulson's nor Director Lockhart's September 6th statements, nor SPSPA specific language served to eliminate, or attempted to eliminate the federal government guaranty of timely payment of Fannie, Freddie obligations created by reason of the guaranty being in privity with Fannie Mae and Freddie Mac preferred share CODs, from the instant of the shares' initial marketing as "government securities."

7.    Board of Directors' obligations to make reasonable, good-faith determinations in their "sole discretion" every fiscal quarter as to whether or not to declare Junior Preferred share dividend payments, or to "declare or pay any dividend" were undisturbed in 2008 SPSPA §5.1's enactment, except in suspension of duties for SPSPA term of financing and directors' otherwise having to obtain Treasury "prior written consent" before the GSEs could "declare or pay any dividend," or "set aside any amount for any such purpose."

8.    Such accumulation being in quarterly reduction of Companies profits under generally accepted accounting principles ("GAAP"), being quarterly in automatic reduction of profit, irrespective of declaration.[3]

---

[3] "Under the SPSPAs, Treasury's financial support is in the form of an equity investment in the Enterprises [i.e., Fannie Mae, Freddie Mac]. The investment is not in common stock, but rather in senior preferred stock. Preferred stock is typically regarded as a hybrid instrument in that it has some features like bonds and others like common stock. Preferred stock is an equity interest, like common stock. However, like a bond, it usually does not confer voting rights, and offers a liquidation preference. A liquidation preference gives the preferred shareholder the right, in the event that the company is dissolved, to receive compensation for its preferred stock typically before common stockholders (but not before bondholders). Senior preferred stock has priority in payment order over other preferred stock. A dividend, should one be paid under the terms of preferred stock, is typically a quarterly payment based on a specified rate applied to the par amount of preferred stock held." White Paper: FHFA-OIG's Analysis of the 2012 Amendments to the Senior Preferred Stock Purchase Agreements, 7 (Mar. 20, 2013), https://www.fhfaoig.gov/Content/Files/WPR-2013- 002_2.pdf (emphasis omitted).

9.     While the SPSPA's requirement of Treasury's "prior written consent" modified the GSEs' procedure regarding the declaration and payment of Junior Preferred dividends, the SPSPAs neither eliminated, nor amended Junior Preferred substantive contractual obligations.  See, e.g., Series Q, § 2(a).[4]  Similarly, The SPSAs did not eliminate the federal government Implicit Guaranty of Junior Preferred legal obligations of timely payment, of legally declared equity share (i.e., common, and preferred) dividends.

10.     On August 17, 2012, attendant to the GSEs return to yearly profitability, Treasury, and FHFA, on behalf of the GSEs, entered into the Third Amendment to the SPSPAs, effective as of January 1, 2013.

**11.     The Third Amendment included a definitional "Net Worth Sweep" provision which, beginning January 1, 2013, required quarterly dividend payments to Treasury, equal to each GSE's profit for the immediately preceding company fiscal quarter.**

12.     The Third Amendment was designed to eliminate further GSEs capital build beyond December 31, 2012, attendant to the companies return to profitability, by net worth profit sweep as SPSPA defined, beginning January 1, 2013, thus compatible

---

GSE Senior Preferred share dividends being cumulative, and Junior Preferred share dividend declaration and payment SPSPA contractually suspended, Company and director directorial discretion with regard to Senior Preferred quarterly dividend declaration and payment evolved to a sole question of cash availability.  However, when the third amendment to the SPSPA (the "Third Amendment" unilaterally changed the Senior Preferred dividend entitlement from 10% annual payable quarter annually to a quarterly sweep of all profits, attendant to the GSEs' year-end 2012 capital surplus being fixed at approximately $223 billion (i.e., Junior Preferred $33 billion, Senior Preferred $189 billion), revived directors' duty to consider, and seek Treasury written approval for Junior Preferred share dividend declaration without payment, under general corporate law, in tandem with duty to calculate quarterly profit available for Net Worth Sweep.

[4] Junior Preferred shares being contractually bilateral, required shareholder consent for effective amendment.  Any purported amendment of the CODs by way of unilateral SPSPA provision, other than within the CODs' circumscribed grounds, would be both unlawful and invalid.

with Treasury White Paper of February 2011 announced intent for GSE future liquidation.

13.     Absent in Housing and Economic Recovery Act of 2008 ("HERA") statute invocation of the GSE's conservatorship administration, was any clear congressional authorization allowing for (a) FHFA federal agency to cause the Companies to convey any Junior Preferred share economic (i.e., legal payment) entitlements to Treasury, and/or (b) illegally extract in Fifth Amendment taking, without payment of fair consideration, for the approximately $22 billion of Junior Preferred share dividend entitlement, to Senior Preferred in Treasury unjust self-enrichment, January 1, 2013 to date.

14.     Third Amendment employment of "Net Worth Amount" language in definitional exclusion of "any obligation in respect of any capital stock of the Company," SPSPA definition acceptable in GAAP Fannie/Freddie conservatorship governance, is otherwise unacceptable under general corporate law, conservatorship governance.[5]

15.     The Third Amendment neither eliminated, nor in any way altered the Fannie/Freddie Junior Preferred quarterly dividend contract rights, and obligations of Junior Preferred by reason, inter alia, of the shares underwriting, and marketing, with a federal government Implicit Guaranty of shares legal obligation payment.

---

[5] For example, the GAAP rule for determining a company's "Net Worth" (i.e., "Capital") is a rule fixed by simple equation of, assets minus liabilities equals Net Worth.  While the term "Net Worth" is synonymous with other GAAP terms such as "Surplus," "Earned Surplus," "Capital Surplus," and "Capital," it is not synonymous with the term "Profit."

The terms "Profit" and "Net Worth" are GAAP singular to themselves.  Third Amendment usage of the term "Net Worth" to denote the quarterly transfer of GSE profits to Treasury Senior Preferred thus confusing GAAP (apples), SPSPA (oranges), mixed in Third Amendment usage of the term "Net Worth."

v.2.7 5-30-2023 -2

16.     Nonetheless, Treasury, commencing first quarter 2013 and  each quarter thereafter,  caused the GSE directors not to consider, and disregard Junior Preferred share contractual timely dividend declaration entitlement rights.

17.     These quarterly breaches of Junior Preferred contractual quarterly div-idend rights, served to inflate the Companies' quarterly profit amounts, available for Third Amendment sweep, and inflated Senior Preferred dividend payments quarterly engorgement, while depriving the Companies of monies otherwise belonging to Junior Preferred by contract, and payable at conservatorship ending,

18.     The Complaint is anchored in Treasury's wrongful actions, each and every quarter beginning January 1, 2013 to date, of Defendant actions preventing the Companies' board of directors from (a) declaring Junior Preferred share dividends, and/or (b) seeking Treasury permission to at least declare but not pay such dividend amounts.  Such actions being in continuous quarterly breach, and separately actionable at occurrence by reason of each and every breach being founded at occurrence inde-pendent of each other.

19.     The Complaint is not an illegal taking claim in challenge to the validity of Third Amendment enactment.  The Complaint is instead grounded in ten (10) years of Treasury continuous contractual breach, and illegal extraction quarterly taking, fol-lowing the 2012 promulgation of the Third Amendment, beginning January 1, 2013 and continuing to date.[6]

---

[6] Approximately $25 billion of litigation proceeds obtained in actions against mortgage originators for activities in violation of securities laws in foisting more than $200 billion of defective mortgage product on Fannie, Freddie illegally Net Worth Sweep swept to Treasury 2013-2016 are sui generis and thus not complained of herewith.

## **Implicit Guaranty**

20.    Defendant, in January 17, 2023 motion to dismiss ("MTD") *Angel v.*

*United States* No. 22-867 complaint ("*Angel II* Complaint"), alleged:

> *"Over the years, both Enterprises issued multiple series of preferred and common stock.  The terms of these stock issuances are governed by the relevant certificate of designation (COD).*
>
> *Although the Enterprises are government-sponsored, the statute that has governed regulation of the Enterprises since 1992, and mirrored by HERA in 2008, contains two separate provisions specifying that their securities are not guaranteed by the Federal Government:*
>
>> *The Congress finds that... neither the enterprises... nor any securities or obligations issued by the enterprises... are backed by the full faith and credit of the United States.*
>
> *12 U.S.C. §4501(4).*
>
>> *This chapter may not be construed as implying that any such enterprise... or any obligations or securities of such an enterprise... are backed by the full faith and credit of the United States.*
>
> *Id. §4503."*  (MTD pages 4 and 5).
>
> *"Nothing in the complaint provides any 'clear indication' that the United States intended to contract with Enterprise shareholders.*  See Mola Dev. Corp*., 516 F.3d at 1378.  On the contrary, HERA expressly states that neither the Enterprises nor their securities are guaranteed by the United States.  12 U.S.C. §4501(4) ('[N]either the enterprises... nor any securities or obligations issued by the enterprises... are backed by the full faith and credit of the United States;'); 12 U.S.C. §4503 ('This chapter may not be construed as implying that any such enterprise... or any obligations or securities of such an enterprise... are backed by the full faith and credit of the United States.').*
>
> *Additionally, the absence of a contract between Mr. Angel and the United States defeats his claim for breach of the implied covenant of good faith and fair dealing.  Where no contract exists, no implied covenant of good faith and fair dealing exists."*[7]  (MTD pages 22 and 23).

---

[7] See also *Angel v. United States*, 22-867C, Decision and Order May 12, 2023 at page 15 wherein the Court in affirmation of Defendant allegation stated: Since 1992, however, the United States has explicitly disavowed any Treasury guarantee of the shares or obligations of the Enterprises. *See* 12 U.S.C. §4501(4)

21.    Alan Greenspan, who served as chairman of the Federal Reserve Board from 1987 through 2006 retirement, presumptively aware of the Federal government statutory disavowal of full faith and credit for GSEs securities in 2007 memoir, "The Age of Turbulence," reflects on  financial market perception of Fannie Mae and Freddie Mac securities, as Federal government payment guaranteed at memoir page 242 as follows:

> "They are granted a **de facto subsidy** by financial markets in the form of interest rates with very low credit-risk premiums on their debit – the **markets presume Uncle Sam will bail them out in the event of default**.  Fannie and Freddie had been using this subsidy to pad their profits and grow."  [Emphasis Supplied]

22.    Former Treasury Secretary Henry M. Paulson, Jr. in Fannie, Freddie conservatorship press announcement September 7, 2008 noted government complicit allowance in market perception of an Implicit Guaranty for timely payment of GSE securities to gain market adherence as follows:

> "These Preferred Stock Purchase Agreements were made necessary by the **ambiguities in the GSE Congressional charters, which have been perceived to indicate government support for agency debt and guaranteed MBS**.  Our nation has tolerated these ambiguities for too long, and as a result GSE debt and MBS are held by central banks and investors throughout the United States and around the world who believe them to be virtually risk-free.  Because the U.S.  Government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt and MBS." (*Emphasis added*)

23.    Regarding government payment guaranty support for Junior Preferred

---

(stating that "neither the [E]nterprises . . . , nor any securities or obligations issued by the [E]nterprises . . . , are backed *Angel II* by the full faith and credit of the United States"), 4503 ("This chapter may not be construed as obligating the Federal Government, either directly or indirectly, to provide any funds to [Fannie Mae or Freddie Mac], or to honor, reimburse, or otherwise guarantee any obligation or liability of [Fannie Mae or Freddie Mac].")"

timely legal payment, the Treasury in September 11, 2008 press corrective reverse of

September 6 Fannie Mae cancellation of August 2008 $400 million declared Fannie

Mae common and preferred dividends, and cancelled dividend reinstatement dispositive

of equity security Implicit Guaranty of timely payment same as debt securities:

> "Some may speculate that a future Congress could pass a law that would abrogate the agreement. But any such law would be inconsistent with the U.S. government's longstanding history of honoring its obligations. Such action would also give rise to government liability to parties suing to enforce their rights under the agreement.

> The U.S. Government stands behind the preferred stock purchase agreements and will honor its commitments. Contracts are respected in this country as a fundamental part of rule of law."

and

> "What happens to the declared dividends for investors of existing GSE preferred stock?  Dividends actually declared by a GSE before the date of the senior preferred stock purchase agreement will be paid on schedule."

24.    In an April 2009 paper entitled "The 2008 Federal Intervention to

Stabilize Fannie Mae and Freddie Mac," financial economist W. Scott Frame of the

Federal Reserve  Bank of  Atlanta  summarized  the  government's  implicit  guaranty

of  GSE securities as follows:

> *"The features of Fannie Mae's and Freddie Mac's federal charters, coupled with some past government actions, [have] long served to create a perception in financial markets that the federal government 'implicitly guarantees' the GSEs' financial obligations... despite explicit language on ...the GSEs' securities that they are not obligations of the federal government."*

25.    Frame in said working paper further noting that the GSEs issue

"**'government securities'** as classified under the Securities Exchange Act of 1934."

26.    The question of whether GSE securities qualify as **government**

**securities** is addressed and answered squarely in Comptroller of the Currency

Administrator of National Banks Interpretive Letter #931 (hereinafter IL #931), dated

March 15, 2002. Employing 12 U.S.C. 24(7) as its authority, IL #931 states as follows:

> Section 24(Seventh) permits national banks to hold "mortgages, obliga-
> tions, or other securities which are or even have been sold by [Freddie
> Mac] pursuant to section 305 or section 306 of the  Federal Home Loan
> Mortgage Corporation Act." Section 306(g) of the Federal Home Loan
> Mortgage Corporation Act empowers Freddie Mac to issue ''preferred
> stock on such terms and conditions as the Board of Directors shall pre-
> scribe."  Freddie Mac preferred stock is a "security" that national banks
> may hold under section 24(Seventh).[8]

27.     Board of Governors of the Federal Reserve System Internal Discussion

Paper dated March 2012 (Federal Reserve Paper 1045), analyzes the effect on com-

munity bank solvency, and lending practices, emanating from the GSE conservatorship

September 2008 Dividend Suspension Announcement.  Federal Reserve Paper 1045

conclusively establishes the existence of a federal government implicit guaranty of GSE

preferred shares as indisputable, and central to the shares *de jure* marketing as "Govern-

ment Securities," and federal government guaranty of Junior Preferred legal obligations

timely payment (i.e., Implicit Guaranty), no different from that of GSE debt, as ack-

nowledged by Treasury announcement September 11, 2008.[9]

## 2022 *Angel II* Settlement Agreement

### A.   Background Principles

28.     With no specific rules for the FHFA GSEs conservatorship beyond the

---

[8] Comptroller of the Currency Administrator of National Banks Interpretive Letter #931, April 2002 http://www.occ.gov/static/interpretations-and-precedents/apr02/int931.pdf

[9] *De jure* marketing fostered by 15 U.S.C. § 78m (requiring every security issuer to file with SEC). If a securities issuer issues only "exempted securities," it need not register with the SEC, as required by 15 U.S.C. § 78c (defining "exempted securities" to include "government securities") and (defining "govern-ment securities" to include Fannie and as Freddie securities). The GSEs' securities may also be exempt pursuant to 15 U.S.C § 77c because they are "instrumentalities" of the United States. *See also* Rice and Rose, Board of Governors of the Federal Reserve System Internal Discussion Paper 1045, *When Good Investments Go Bad*, March 2012 ("*IFDP 1045*").

Housing and Economic Recovery Act ("HERA") enactment statute, courts need to employ a general body of background legal and accounting principles ("Background Principles"), such as the Constitution, the United States Bankruptcy Code ("Bankruptcy Code"), and general accepted accounting principles ("GAAP") in Federal statute legal governance.[10]

29.    Principles of the governing conservatorship and Federal insolvency law (i.e., Bankruptcy Code inclusive) requires that a final resolution of the conservatorship leave unaltered the legal, equitable, and contractual rights of the Junior Preferred unless the holders of Junior Preferred agree to any impairment. Cf., 11 U.S.C. §1124.  The determination of whether a claim is impaired under federal insolvency law is not subject to a statute of limitations. Cf., 11 U.S.C. §108.  The Treasury Defendant refusal to abandon its statute of limitations arguments in *Angel III* MTD precludes monetary payment in amount less than total in monetary breach (i.e., statute of limitation regardless), plus interest and costs of Junior Preferred dividend payment January 1, 2013 to date, to meet the restoration in full requirement of conservatorship and federal insolvency law.

## B.  <u>GAAP In Background Principles</u>

30.    Dividend rights are the defining characteristic of preferred shares. Dividends are payable to shareholders from surplus (i.e., Net Worth), at a defined dividend period. A corporate board of directors determines whether to declare a dividend, and

---

[10] See *The Conservatorship of Fannie Mae and Freddie Mac: Actions Violate HERA and Established Insolvency Principle*, a Cato Institute Working Paper authored by Michael Krimminger, who was senior policy adviser with the FDIC at the time of the creation of HERA, and former FHFA director Mark Calabria, who was a member of the senior professional staff to Senator Richard Shelby, Chairman of the United States Senate Committee on Banking, Housing and Urban Affairs at that time. The Cato paper is available at https://investorsunite.org/wp-content/uploads/2015/01/Krimminger-Calabria-HERA-White-Paper-Jan-29.pdf No. 26/CMFA No. 2.

that determination for noncumulative shares must be made within a specific time prior to the time fixed for dividend payment. Once a dividend is declared by the board, GAAP requires the declared dividend amount to be reflected as a liability on company balance sheets, (i.e., preferred dividend payable); and as an item on income statement (i.e., preferred dividend expense) in reduction of income, or prior Net Worth in event where there is no profit for the period being swept.

31.     Under GAAP declared dividend amounts, are in automatic reduction of quarterly net income, and Junior Preferred dividends once declared, reduce profits available for Treasury Net Worth Sweep conversion.  Non-declaration conversely serves to increase the profit amount available for Treasury Net Worth Sweep.  By def-inition, "non-cumulative" preferred share dividends passed without declaration ("Passed Dividends") in a particular year or period are gone forever, and there is no obligation to pay a Passed Dividend when the next dividend declaration period arrives.

A.  Example Explanation

1.     Assuming (i) GSEs quarterly profit of $2 billion before preferred share dividend declaration, and/or in case of cumulative preferred shares the shares contractual payment date, (ii) Junior preferred share quarterly dividend obligation of $500 million, and (iii) Senior Preferred share net worth sweep entitlement; Junior Preferred share *dividend declaration* of $500 million without payment would engender combined GAAP accounting reflection as follows:

Day 1 Dividend Declaration
Debit:  Company Earned Surplus $2 billion
Credit: Senior Preferred "Capital Reserve" (i.e., Surplus) $1.5
        billion Junior Preferred Capital Reserve (i.e., Surplus)
        $500 Million

2.     *The simple act of GSE non-declaration of Junior Preferred Share quarterly dividends,* having eliminated the Junior Preferred Share dividend charge to quarterly profit, automatically in increased dollar for dollar amount profit availability for Net Worth Sweep Senior Preferred dividend payment with GSE financial statements result as follows:

Day 2 Dividend Payment
Debit: Company earned Surplus $2 billion
Credit: Cash $2 billion
Note:  GSE Balance Sheet GAAP reflection being as follows:
1.  Company Earned Surplus $0
2.  Cash $0
3.  Junior Preferred Capital Reserve (i.e., surplus) $0

## C.  **SPSPA Fifth Amendment**

32.    On September 30, 2019, Treasury and FHFA announced their joint

agreement to modifications of the SPSPA, so as to allow Fannie Mae and Freddie Mac

to maintain Capital Reserves of $25 billion and $20 billion respectively, as recom-

mended in the Treasury 2019 Housing Reform Plan released on September 6, 2019.

Fifth Amendment operative language for building GSEs respective Capital Reserve

Amounts being:

> "(C) for each Dividend Period from January 1, 2018, through and in-
> cluding June 30, 2019, $3,000,000,000; and (D) for each Dividend Period
> from July 1, 2019, and thereafter $25,000,000,000 [$20,000,000,000].
> *Notwithstanding the foregoing, for each Dividend Period [from January 1,
> 2018, and thereafter, following any Dividend Payment Date with respect
> to which the Board o[ Directors does not declare and pay a dividend or
> declares and pays a dividend in an amount less than the Dividend Amount,
> the Applicable Capital Reserve Amount shall thereafter be zero. For the
> avoidance o[doubt, if the calculation of the Dividend Amount for a Div-
> idend Period does not exceed zero, then no Dividend Amount shall accrue
> or be payable %r such Dividend Period."* [Emphasis supplied.]

33.    The operative effect of the above-emphasized portion of the Fifth

Amendment, is for GSE's Capital Reserve amount to build by simple expedient of

declared dividend non-payment, with an attendant balance sheet suspended cash hold in

reserve account suspension, assuming, for example, a GSE's quarterly profit Senior

Preferred pre-Third Amendment Net Profit Sweep entitlement without Senior Preferred

Share payment, and dividend declaration for Junior Preferred Shares, GAAP Fifth

Amendment treatment would be:

> Day 1 Dividend Declaration or Cumulative Preferred Maturity:
> Company Earned Surplus $0 billion
> Credit: Senior Preferred Capital Reserve (i.e., Surplus) $2 billion
> Note: GSE, Balance Sheet GAAP reflection being as follows:
> 1. Company Earned Surplus $0
> 2. Cash $2 billion
> 3. GSEs Senior Preferred Capital Reserve $2 billion

34.     The Fifth Amendment workings was explained by the government in

*Fairholme Funds, Inc. et al, v. Federal Housing Finance Agency,* No. 13-1053, as

follows:

> Under the amendment Treasury has agreed to forgo further cash div-
> idends until the enterprises build sufficient capital to meet regulatory
> requirements, a build-up that is expected to take several years. Once the
> enterprises begin paying dividends to Treasury again, moreover, they
> will not be required to pay Treasury funds from the capital that they
> have amassed. The agreement also sets forth the conditions under
> which Treasury will agree that the enterprises may exit conservatorship
> and allows the enterprises to raise capital through the issuance of
> common stock when certain conditions are met.

## 2022 *ANGEL II* Settlement Agreement (Continued)

35.     On October 27, 2020 Plaintiff filed a consensual (i.e., unopposed)

motion to suspend briefing in *Angel II,* pending decision in *Collins,* stating:

> "*In resolving the statutory and constitutional challenges raised in
> Collins, the Supreme Court is virtually certain to decide one or more
> issues that may impact this Court's resolution of Plaintiff's Motion For a
> Continuance, and/or Defendants MTD.  In fact, a key issue to be resolved
> in Collins is whether the FHFA is constitutionally structured and if not,
> whether FHFA lacked the authority to enter into the Third Amendment in
> the first place*.

*     *     *

However, as pointed out by the *Collins* amicus court appointee, the government Implicit Guaranty of GSE securities payment, and operating subsidies, are just some of the reasons why the FHFA is structured correctly:

> The GSEs are not ordinary businesses. Fannie and Freddie, for example, enjoy exemptions from regulation and taxation… and special borrowing rights from Treasury… Before the housing crisis, the Congressional Budget Office valued such 'subsidies' at billions of dollars… In fact, because '[m]ost purchasers of the GSEs' debt securities believe that this debt is implicitly backed by the U.S. government,' the subsidy may be worth 'between $122 and $182 billion'… without these 'special privileges,' Fannie and Freddie could well 'be forced out of business.' (Amicus Brief pp. 27-28).

> \*    \*    \*

For the foregoing reasons, Plaintiff respectfully requests that the Court grant this unopposed motion and temporarily suspend briefing relating to Plaintiff's motion for a continuance to permit discovery *until after the Supreme Court issues its decision in* Collins." [Emphasis Added]"

36.    Attendant to its October, 2020 grant of Plaintiff's unopposed motion to suspend briefing, the Court denied prior Defendant MTD, and Plaintiff Motion for Continuance, as moot, and stayed the *Angel II* case without date until further order of the Court, directing the Parties "file a joint status report within thirty days of the *Collins* decision proposing further proceedings in this matter" (hereinafter "October 27, 2020 Briefing Suspension Stay Order").

37.    On June 22, 2021, the Supreme Court issued a *Collins* decision, dismissing *Collins* Plaintiff Questions, and resolving both Government Questions in favor of the government, with tangential benefit of neutralizing Treasury's asserted jurisdictional defense of lack of privity between Junior Preferred, and government implicit guaranty of shares timely payment.

38.     Waiting for *Collins* afforded the Parties the opportunity to construct a in-formal settlement protocol, whereby Plaintiff counsel, after discussion with Defendant counsel was invited to formulate as *Plaintiff Proposals* settlement proposals for, (a) De-fendant counsel review, and if counsel acceptable, (b) Defendant counsel submission to agency client, for client exclusive, unconditional, absolute option, to either accept or reject (no explanation required, no feedback) (the "Settlement Protocol").

39.     The Settlement Protocol resulted in a preliminary draft Settlement Agreement, dated June 10, 2021, delivered to Defendant counsel for client review.  On June 17, 2021, Defendant counsel acknowledged Settlement Agreement receipt, stating; "Thank you for your proposal.  We will review internally with the agencies, and get back to you.  Thanks."

40.     In practical terms, the *Angel II* Settlement Agreement effected a *status quo ante* dividend restoration for Fannie Mae and Freddie Mac junior preferred shares ("Junior Preferred") without immediate cash payment exactly as if the shares were dividend cumulative rather than non-cumulative.  Saying the same thing another way, the Settlement Agreement had the same financial and accounting effects as if Defen-dant, instead of directing the Companies' boards not to declare Junior Preferred dividend, had simply allowed GSE directors to discharge their duty to consider and declare Junior Preferred share dividends without Defendant contra direction.

41.     The *Angel II* Settlement Agreement provided for Treasury to direct GSE respective BOD to affect a simple redivision, and forced sharing of $20 billion of Senior Preferred capital reserve dollars, in retrospective corrective sharing, of Senior

Preferred capital reserve amounts to Junior Preferred shares, and shared Capital Reserve amounts eventual conversion into GSE common shares, instead of cash payment.

42.     In or around January 2022, the parties finalized an agreement to *Angel II* Settlement Agreement .  The January 2022 Agreement, which was attached in Joint Status report to the Court, March 24, 2022, would – if not later repudiated by the Defendant – have effected a *status quo ante* dividend restoration for Fannie Mae and Freddie Mac junior preferred shares ("Junior Preferred") without immediate cash payment exactly as if the shares were dividend cumulative rather than non-cumulative.

43.     Saying the same thing another way, the Settlement Agreement had the same financial and accounting effects as if Defendant, instead of directing the Companies' boards not to declare Junior Preferred dividend, had simply allowed GSE directors to discharge their duty to consider and declare Junior Preferred share dividends without Defendant contra direction.

44.     The *Angel II* Settlement Agreement provided for Treasury to direct GSE respective BOD to affect a simple redivision, and forced sharing of $20 billion of Senior Preferred capital reserve dollars, in retrospective corrective sharing, of Senior Preferred capital reserve amounts to Junior Preferred shares, and shared Capital Reserve amounts eventual conversion into GSE common shares, instead of cash payment. *See* Memorandum Appropriate Remedies for Treasury Quarterly Actions Causing a Breach of Contract.

45.     On March 16, 2022, eight days short of the then-agreed-to filing date for Settlement Agreement in JSR courtesy attachment filing, Defendant advised Plaintiff:

"…*will not be accepting your settlement offer, nor entering any*

*stipulations at this time. Moreover, we are not interested in further settle-*
*ment discussion at this time… We anticipate that we will likely seek dis-*
*missal of your complaint, along with the complaints in the other cases that*
*are currently stayed, in reliance upon* Fairholme *and* Washington Federal.
*We will also seek to resume the Court's consideration of the statute of*
*limitations issue in your case.*"

# II.   <u>THE PARTIES</u>

46.    Plaintiff Joshua J. Angel is a resident of New York, and owns Junior
Preferred Shares of both Fannie Mae and Freddie Mac, purchased after Third Amend-
ment enactment, in amount in excess of $1 million face amount.

47.    Plaintiff alleges that all of the Complaint cause of action counts, in
damage and/or declaratory entitlement demand run with the shares, irrespective of time
of purchase.

48.    Defendant United States Department of Treasury ("Treasury" or "U.S.
Treasury") is an agency or instrumentality ("Federal Agency") of the United States,
having its headquarters at 1500 Pennsylvania Avenue, NW, Washington, DC 20220. It
is the post GSE conservatorship purchaser, and owner of 100% of the approximately
$189 billion of the Fannie Mae and Freddie Mac Senior Preferred shares issued
between September 2008 and December 31, 2012.

# III.   <u>JURISDICTION AND VENUE</u>

49.    The Court has jurisdiction over this action, and venue is proper in this
Court pursuant to 28 U.S.C. § 1491(a). Plaintiffs have directed claims under the
Tucker Act that are worth more than $22 billion. Plaintiff's claims emanate from
Treasury Agency unauthorized taking for itself of approximately $22 billion of Fannie

Mae and Freddie Mac funds which by law should have remained with the companies, and Treasury breach of its contractual guaranty of GSE Junior Preferred share payments, and concurrently rendering $33 billion of Junior Preferred shares (i.e., par value) as permanently impaired and otherwise mandatorily redeemable at action or conservatorship end if not otherwise made whole with regard to estimated then impairment of $20 billion, at either termination of this action, or the conservatorship.  *See* Bankruptcy Code §1124.

## IV.   <u>FACTUAL ALLEGATIONS</u>

**A.    The GSEs and Junior Preferred Shares**

50.    Fannie Mae, and Freddie Mac are federally chartered, privately owned companies that serve public interest purposes, namely: (1) making homes affordable, (2) providing foreclosure relief keeping the secondary mortgage market competitive, stable, and efficient, and (3) increasing secondary mortgage market liquidity.  To achieve their goals, the GSEs publicly issue stock and purchase and securitize mortgages as mortgage-backed securities for sale to the public.

51.    Among the securities issued by the GSEs pre-conservatorship are the GSEs' Junior Preferred shares.

52.    Each series of the GSEs' respective Junior Preferred Shares, is pursuant to a substantially similar COD.

53.    All series of Junior Preferred Shares rank in parity with each other, in regard to state law dividend provision.  See, e.g., Series Q, 2(a), 2(b); Freddie Mac, Offering Circular, A-2- 4 (Nov.  29, 2007).  Within the general class "preferred share

securities," Junior Preferred shares enjoy inherent equality of treatment rights in tandem with other preferred share securities.  GSEs' directors may not prefer one security in a class over another security in the class by subterfuge, and in effect, taking of monies rightfully belonging to one class member to increase payments to another class member.

54.     GSEs, Junior Preferred share capital of approximately $33 billions of par issuance as of September 6, 2008 (i.e., Fannie Mae $19 billion, Freddie Mac $14 billion) together with approximately $189 billion of Treasury purchased Senior Preferred, have remained constant in providing in excess of $222 billions of GAAP balance sheet surplus (i.e., of funds legally available for dividend payment), on the GSEs' financial statements from December 31, 2012 to date.  Indeed, it is the existence of that surplus which allows for the Treasury's quarterly sweep of the GSEs' post-January 1, 2013 profits.

55.     In July 2008, during the financial crisis of 2007 to 2008, the GSEs' regulator certified both GSEs to be adequately capitalized.

56.     On August 8, 2008, the Fannie Mae Board declared a $413 million dividend on the Fannie Mae's Junior Preferred Shares, payable on September 30, 2008 (the "$413 million Pre-Conservatorship Declared/Unpaid Junior Preferred Dividend").

57.     On September 6, 2008, FHFA placed the GSEs into conservatorship and appointed itself Conservator of the GSEs.  On September 7, 2008, then-FHFA Director Lockhart, in joint statement with then-Treasury Secretary Paulson, announced the SPSPA conservatorship financing's attendant duration suspension of GSE Junior Preferred dividend declaration and payment without prior Treasury written consent.

58.     On September 11, 2008, Treasury unequivocally confirmed the federal

government's guaranty of payment's enforceability and validity of the Fannie Mae $413 million declared dividend liability, and retracted the dividend's September 7, 2008 cancellation stating, "Contracts are respected in this country as a fundamental part of rule of law.[11]

59.    Treasury's quarterly breaches of the contractual obligations in the CODs and Implicit Guaranty in outsized ignorance of congressional HERA statutory authorization, are the essence of the issues herein complained of.[12]

60.    On January 14, 2021, Treasury and FHFA entered into formal amendment of the SPSPAs inclusive of Fourth and Fifth SPSPA letter agreement provisions prior agreement to amend the SPSPAs as set forth in letter agreements for Fannie,

---

[11] Prior to Fannie Mae and Freddie Mac entry into conservatorship on September 6, 2008, the federal government guaranteed payment for GSEs securities.  On September 7 and 11, 2008, Treasury officials issued a statement wherein, and whereby the Implicit Guaranty of GSEs securities payment was made explicit (the "Guaranty") stating "Contracts are respected in this country as a fundamental part of rule of law").  The federal government Implicit Guaranty of GSEs financial obligations was critical to the GSEs' ability to market, and successfully sell, hundreds of billions of dollars of GSEs guaranteed mortgage backed securitized debt ("MBS"), and approximately $22 billions of GSEs Junior Preferred shares, as riskless perpetual capital suitable for financial institution as tier one capital in the pre-conservatorship period of less than one year, beginning late 2007 through May 2008.  Fannie Mae's ability, in May 2008, to sell $4.8 billion of 8.75% mandatory convertible Junior Preferred shares, four months prior to the Company's September 6, 2008 entry into conservatorship, was the undoubted result of market acceptance, and reliance on the government Implicit Guaranty of Junior Preferred share payments.  See W. Scott Frame, The 2008 Federal Intervention to Stabilize Fannie Mae and Freddie Mac, Federal Reserve Bank of Atlanta (2009); Tara Rice & Jonathan Rose, When Good Investments Go Bad: The Contraction of Community Bank Lending After the 2008 GSE Takeover, Board of Governors of the Fed. Res.  Sys., Int'l Fin.  Discussion Papers 1045 (2012); and Comptroller of the Currency Administrator of National Banks Interpretive Letter #931.  April 2002 http://www.occ.gov/static/interpretations-andprecedents/apr02/int931.pdf.  The federal government Implicit Guaranty of GSE securities contractually mandated payments was essentially the same for the companies' debt and Junior Preferred securities.

[12] Irrefutable evidence of the GSEs' option to determine whether or not to declare dividends and pay them with Treasury prior written consent as a power intended for use, and not just fluff, can be found in Fannie Mae's Form 10- K, dated December 31, 2008, regarding the $413 million Pre Conservatorship Declared/Unpaid Junior Preferred Share Dividend as follows:

"[T]he senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on [other] Fannie Mae equity securities .  .  .  without the prior written consent of Treasury.  We were permitted to pay previously declared but unpaid dividends on our outstanding preferred stock for the third quarter."

Fannie Mae, Annual Report (Form 10-K), 76 (Dec.  31, 2008) (emphasis added)

Freddie capital restoration entitled "SPSPAs Fourth Amendment." Stating therein, Treasury has "...begun work to establish a timeline and process to terminate the conservatorship and raise capital."

61.    That same day, Treasury issued a public press release in which it set forth conditions for the Companies' release from conservatorship, inter alia, as follows:

> "Treasury establishes no exit from Conservatorship with less than three (3%) percent capital."
>
>                     *    *    *
>
> "Allow for Common Stock Issuance at appropriate time: Treasury will allow each GSE to issue common stock upon achievement of future conditions; first, Treasury must have exercised in full its warrant to acquire 79/9% of the GSEs common stock; and second, all material litigation relating to the conservatorship must have been resolved or settled. Treasury will permit up to $70 billion in proceeds in stock issuance by each GSE to be used to build capital."[13]

# V.    CLASS ACTION ALLEGATIONS

62.    Plaintiff brings this class action on behalf of himself and the Class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and/or (b)(3) on behalf of himself and a nationwide class of persons consisting of:

> all persons who hold Junior Preferred Shares, of either of Fannie Mae or Freddie Mac issued prior to September 6, 2008.

63.    Class members are so numerous that their joinder is impracticable. The exact number of Class members is currently unknown to Plaintiff and is ascertainable through appropriate discovery. Plaintiff believes that Class members will number at

---

[13] Press release available at home.treasury.gov/news/press-release/SM1236.

least in the thousands.  Class members are identifiable from records maintained by Defendants and/or the GSEs' stock transfer agents, and they can be adequately notified of the pendency of this action by mail.

64.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class. Those questions include:

a.    Whether Treasury breached its contractual guaranty of GSE Junior Preferred share payments, quarter by quarter beginning January 1, 2013 to date and continuing, as it directed;

(i)    GSE director Quarterly Dividend Duty non-compliance, and/or

(ii)    GSE director failure to seek its written approval for Junior Preferred dividend declaration without immediate payment; and/or

(iii)    GSE director Third Amendment Senior Preferred Net Worth Sweep outsized dividend declaration performance

b.    Whether Treasury breached the implied covenant of good faith and fair dealing inherent in its contractual guaranty of GSE Junior Preferred share payments quarter by quarter beginning January 1, 2013.

c.    The extent to which Treasury's actions as set forth above directly damaged Plaintiffs.

65.    Plaintiff's claims are typical of the claims of the other Class members, all of whom hold Junior Preferred Shares and were similarly affected by Defendants' alleged misconduct.

66.     Plaintiff and his counsel can and will fairly and adequately pursue the interests of the Class members.

67.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Individual litigation would be highly impracticable for Class members to each seek redress for the harms that the alleged misconduct caused.  Class members' individual damages are believed to be relatively small, and the expense and burden of individual litigation is enormous.

68.     The prosecution of individual actions by Class members could cause inconsistent or varying adjudications that would: establish incompatible standards of responsibility for Defendants; be dispositive of the interests of other Class members who are not parties to the adjudications; and substantially impair Class members' ability to protect their interests.

# VI.    CAUSE OF ACTION

## COUNT I

## QUARTERLY BREACHES OF CONTRACT

69.     Plaintiff realleges every allegation in this Complaint as if fully set forth herein.

70.     The Junior Preferred CODs are contracts that create contract rights for the Plaintiff and contract obligations for the Defendant.

71.     At all times herein relevant Treasury implicitly guaranteed Fannie Mae, and Freddie Mac Junior Preferred dividend rights.

72.     The Third Amendment could not and did not eliminate the Junior Pre-

ferred's contract rights created by the CODs or the Junior Preferred contract rights created by the Implicit Guaranty.

73.    The Third Amendment did not breach Junior Preferred's contract rights. Rather, it was Treasury's quarterly actions preventing the Companies' board of directors from complying with their obligations under the CODs and the Implicit Guaranty that breached Junior Preferred shareholder contract rights.

74.    Such quarterly Treasury actions beginning January 1, 2013, caused Fannie Mae Junior Preferred shares to suffer damages for contractual breach of approximately $22 billion to date.[14]

# COUNT II
# ILLEGAL EXTRACTION

75.    Plaintiff realleges every allegation in this Complaint as if fully set forth herein.

76.    HERA created a conservatorship and provided for broad but not unlimited powers for the Conservator.

77.    HERA did not (i) eliminate the GSEs, (ii) eliminate private ownership of the GSEs, or (iii) eliminate the contract rights of the private owners.

78.    A conservator of an entity owes a fiduciary duty, not only to the creditors of that entity, but also to the owners of that entity.

79.    Treasury engaged in wrongful acts in conducting the Conservatorship, by each quarter directing and otherwise causing GSE directors to disregard Junior Pre-

---

[14] Pursuant to Delaware and Virginia law, all the rights and liabilities associated with corporate stock, including causes of action, transfer with the shares. See 6 Del. C. § 8-302; Va. Code Ann. § 8.8A-302; and Fairholme Funds, Inc. v. FHFA, No. 13 Civ. 1053 (RCL), 2018 WL 4680197 (D.D.C. Sept. 28, 2018).

ferred contractual payment rights and effecting quarterly outsized sweeps of Companies' profits, inclusive of approximately $22 billion of Junior Preferred share contractual dividend rights to itself.

80.     In effecting these quarterly unauthorized sweeps, Treasury rendered the $33 billion of GSE Junior Preferred shares permanently impaired, making Defendant responsible to effect sums which it illegally extracted within six (6) years of complaint filing payable with interest t in connection with this action.

# COUNT III
# §1124 DECLARATORY RELIEF
# RE: IMPAIRMENT MANDATORY REDEMPTION

81.     Plaintiff realleges every allegation in this Complaint as if fully set forth herein.

82.     HERA did not eliminate Junior Preferred;  HERA did not substantively change the contract rights of the Junior Preferred, including the contract right to a quarterly dividend determination.

83.     HERA did give  the Director of FHFA the discretionary authority to put Fannie and Freddie into either conservatorship or receivership.

84.     The Director chose conservatorship for Fannie  and Freddie.

85.     The choice of conservatorship instead of receivership is substantively significant,  The role of and law relating to conservator is different from the role of and law relating to a receiver.  A conservator's duty is to operate, rehabilitate, and restore the financial health of the troubled institution. When that is achieved, the conservatorship is terminated, and the institution is returned to the private sector.

86.    More important,  at the termination of a conservatorship, the conservator of an entity must respect the contract rights of the shareholders of that entity,   Cf O'Melveny & Myers v FDIC, 512 U.S. 79, 86-87  (1994).  In the O'Melveny case, the FDIC was purporting to have some powers to do things beyond what the statute said, and what the Supreme Court said was when you become conservator or receiver, you step into the shoes of the entity, in this case, Fannie and Freddie.   --you have all the obligations that they had except to the extent that the resolution statute expressly overrides those.

87.    Again, HERA, the resolution statute, did not eliminate or substantively change the dividend rights of the Junior Preferred and so the conservatorship cannot effect a substantive change in the dividend rights of the Junior Preferred.

88.    Accordingly, the legal  concepts of conservatorship law as well as  federal insolvency law, including Title 11, require that  termination of the conservatorship must include Fannie Mae and Fredie Mac's belated effectuation of the Junior Preferred's dividend rights so that  the conservatorship does not result in a nonconsensual impairment of the Junior Preferred's contract rights and there are no statute of limitations constraints in determining whether the conservatorship's meets that requirement.  Cf 11 USC 1124, 109

89.    Moreover, under the legal concepts of conservatorship law and federal insolvency law, satisfaction of Treasury's own conditions for the GSEs' exit from the conservatorship as set out in the Treasury press release of  January 14, 2021 will require full reinstatement of the Junior Preferred, and make whole payment of not less than $20 billion inclusive of cure and interest payment.

# COUNT IV
## *ANGEL II* SETTLEMENT AGREEMENT
## BREACH OF CONTRACT DAMAGES

90.     Plaintiff realleges every allegation in this Complaint as if fully set forth herein.

91.     General contract law principles govern contract litigation in which the federal government is a party.

92.     Under general contract law principles.  Plaintiff's settlement proposal delivered to the Defendant on June 10, 2021 constituted an offer.

93.     Under general contract law principles, the words and conduct of Defendant's agents from June 2021  to  January 2022 constituted an  acceptance, i.e., "manifestation of assent to the terms thereof," resulting in the formation of a contract as provided in Restatement (Second) of Contracts section 171(1).

94.     Under general contract law principles, a party to a contract cannot "unaccept" an already accepted offer.

95.     Accordingly, Defendant's email of March 16, 2022, was not a refusal to accept an offer that had already been accepted, but rather a breach of an existing contract which gives rise to Plaintiff's right to damages for breach of contract.

# COUNT V
## DECLARATORY RELIEF RE:
## FEDERAL GOVERNMENT GUARANTY OF TIMELY

# PAYMENT FOR JUNIOR PREFERRED SHARE
# LEGAL OBLIGATIONS

96.     Plaintiff realleges every allegation in this Complaint as if fully set forth herein.

97.     General contract law principles govern contract litigation in which the federal government is a party.

98.     Accordingly, the Government, like private parties, can enter in unilateral contracts as well as bilateral contracts.

99.     Prior to Plaintiff's purchase of Junior Preferred stock, the words and conduct of Government officials manifested a government commitment to  guarantee the dividend rights of Junior Preferred to induce financial institutions and others to buy Junior Preferred.

100.     Plaintiff purchased Junior Preferred stock in reliance on this implicit guarantee.

101.     Under general contract law principles, the Government's words and conduct created an offer to enter into a unilateral contract and the bargained for conduct by the Plaintiff in buying the Junior Preferred stock was an acceptance of that offer creating a binding unilateral contract.

102.     Commencing with the filing of this complaint, Treasury has sixty (60) days in which to settle, answer, or move in regard thereto.

103.     Based upon Treasury's responses to prior complaints, declaratory relief with regard to this Count is timely.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.      Award $22 billion in compensatory damages under Counts I , II, and IV to the Class against Defendant;

C.      Award declaratory relief, and compensatory attorneys' fees for benefits conferred under Counts III and V to the Class against Defendant;

D.      Award prejudgment and post-judgment interest on those compensatory damages;

E.      Award Plaintiff reasonable attorneys' fees for benefits conferred and awarded compensatory damages, based on a percentage of not less than 2% of costs; and

F.      Order such other relief as this Court deems just and equitable.


Dated:  June 1, 2023
New York, New York

JOSHUA J. ANGEL PLLC


_____
By:  Joshua J. Angel

9 East 79th Street                                    Counsel:
New York, New York  10075                            David G. Epstein
Tel:  (917) 710-2107                                 depstein@richmond.edu
Email:  joshuaangelnyc@gmail.com                     Lewis Kruger  llkruger@aol.com
                                                     *Attorneys for Plaintiff*